Donald Angus McNULTY, Petitioner,

v.

Antone OLIM, in his capacity as Warden, Hawaii State Prison; and Andrew I. T. Chang, in his capacity as Director, Department of Social Services and Housing, State of Hawaii, Respondents.

Civ. No. 79–0572.

United States District Court,
D. Hawaii.

May 9, 1980.

David C. Schutter, Judith Ann Pavey, Honolulu, Haw., for petitioner.

George H. Yamamoto, Deputy Atty. Gen., Wayne Minami, Atty. Gen., State of Hawaii, Honolulu, Haw., for respondents.

## DECISION AND ORDER

SAMUEL P. KING, Chief Judge.

### I. FACTS

Donald Angus McNulty has filed a petition in this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (1976). Petitioner was convicted of murder in the First Circuit Court of the State of Hawaii on June 19, 1975. On August 13, 1975 he was sentenced to 20 years imprisonment. On December 30, 1975 Petitioner's motion for a new trial was denied in the Hawaii First Circuit Court. Petitioner appealed to the Hawaii Supreme Court, and on December 28, 1978 that court affirmed both the conviction and the denial of the motion for

a new trial. *State v. McNulty*, 60 Haw. 259, 588 P.2d 438 (1978), *cert. denied sub nom McNulty v. Hawaii*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). A petition for certiorari was brought in the United States Supreme Court, and was denied on May 21, 1979. Petitioner is presently incarcerated in the Hawaii State Prison, an institution under the direction and control of the respondents.

Petitioner claims that he was denied his Sixth and Fourteenth Amendment constitutional rights to effective assistance of counsel at trial. This issue was raised in Petitioner's appeal to the Hawaii Supreme Court, and hence he has exhausted state remedies as required by 28 U.S.C. § 2254 (1976).

At a hearing before this Court, deposition, affidavit and documentary exhibits, including a transcript of the proceedings of Petitioner's trial, were introduced into evidence. As the Court is of the opinion that the trial transcript speaks for itself on the issue of effective assistance of counsel, the Court has heard no live testimony. The Court believes that the evidence presented to it is sufficient to enable it to rule on the merits of the petition.

The homicide apparently was the product of a love triangle. Petitioner lived with a woman, Frances Mary Hanson, at the time of the killing, and had at that time been living with her, in her apartment, for about two and one-half years. About a month before the killing Petitioner and Ms. Hanson met the decedent, Dion Yancey Cagle, for the first time. Petitioner and a friend were engaged in a "friendly" sparring match and Cagle came by, struck up a conversation, and later went back to Ms. Hanson's apartment with her and Petitioner. During the next month Cagle visited the apartment several times, sometimes at the invitation of Petitioner and sometimes without an invitation. Petitioner testified at trial that he only invited Cagle once. When Cagle visited he usually played poker and drank with Petitioner and Ms. Hanson. Ms. Hanson testified that things were friendly until Petitioner and Cagle had "a

few too many" at which time they usually got into an argument. Petitioner would ask Cagle to leave, and when Cagle would refuse, Petitioner would order him to leave. Ms. Hanson testified that Cagle always left at that point in the argument, and there were never any physical fights between Petitioner and Cagle. (Transcript of Trial of Donald Angus McNulty in the Circuit Court of the First Circuit, State of Hawaii [hereinafter Tr.] at 142–43).

Ms. Hanson testified that Cagle had shown a great deal of interest in her, and had on several occasions told Petitioner that he, Cagle, was going to take Ms. Hanson away. Several weeks before the killing, Cagle and Petitioner had apparently gotten into a loud argument over Ms. Hanson. Cagle had again stated that he was going to take Ms. Hanson away from Petitioner, and had emphasized his point by kissing Ms. Hanson in Petitioner's presence. (Tr. at 143). The argument was so loud that the police were called. Ms. Hanson testified Petitioner stated in anger that "if he caught the two of us together, he would kill us both." (Tr. at 144). There is apparently some question as to when exactly this threat was made, see Tr. at 174–76, but Ms. Hanson's testimony as to the fact of the threat was unequivocal. Petitioner testified that he could not recall having made any such threat.

A short time after this incident, Petitioner went to Detroit for a visit. While he was away, Cagle, Ms. Hanson, and a friend of theirs, Dexter Holst, had some drinks in Holst's apartment. Ms. Hanson testified that Cagle walked her home, and that they had sexual intercourse, "but not on a voluntary basis." (Tr. at 145). Ms. Hanson testified that Cagle attempted to strangle her when she screamed for the neighbors. (Tr. 180–81). She went out to dinner with Cagle the next evening, as dinner was Cagle's way of apologizing, and she also went out with Cagle the evening after that. (Tr. at 181). On the second evening, Ms. Hanson and Cagle also had sexual intercourse. On the third evening, after Cagle and Ms. Hanson had been dancing, Cagle was arrested

for driving while intoxicated, and he was sentenced to jail.

During Cagle's jail-term, Petitioner returned from the mainland. Ms. Hanson informed Petitioner that she and Cagle had been out to dinner several times, and Petitioner colloquially asked Ms. Hanson if she and Cagle had had sexual intercourse. Ms. Hanson told Petitioner that they had not. (Tr. at 147–48). Cagle was scheduled to get out of jail on February 19, 1975, and on that day Petitioner left for work at about 5:30 A.M. His normal working hours were from 7:00 A.M. until 3:30 P.M. He returned home, however, at about 6:15 A.M. and told Ms. Hanson that he had spoken to his boss and was taking the day off. Ms. Hanson testified that Petitioner told her that he "had some business to take care of since Cagle was getting out that day." (Tr. at 149). Petitioner claimed at trial, however, that he had had no idea when Cagle was getting out of jail. Petitioner took Ms. Hanson to the hospital that morning for a pre-scheduled appointment. While she was there Petitioner drove to a pawn shop and redeemed his .44 caliber Magnum rifle, which he had pawned about eight months before. (Tr. at 227–28). Petitioner then picked up Ms. Hanson and they drove home, arriving at about 9:30 A.M. Petitioner testified that upon returning home he loaded the rifle, because he "always kept it loaded" (Tr. at 228), and then placed it in a closet. Petitioner testified that he then had a few drinks.

Ms. Hanson testified that after she returned home she walked over to Holst's apartment, where Cagle was visiting, and stated: "McNulty got his rifle out, this morning, that's all I have to say." (Tr. at 151). At about 11:15 A.M. Cagle went over to Ms. Hanson's apartment, and Petitioner, according to Ms. Hanson, invited Cagle in. Petitioner asked Cagle if he and Ms. Hanson had had sexual intercourse, and Cagle replied that they had not. Cagle and Petitioner then started playing poker with Ms. Hanson dealing. At about 1:00 P.M. Petitioner lost all his money and the game terminated. Ms. Hanson pointed out to the two that some money was missing, and she testified that while she was counting the chips Cagle and Petitioner were engaged in their "general, low-toned hassle". (Tr. at 159). Ms. Hanson described this as Petitioner and Cagle's normal conversation, and said that it was not really an argument. Ms. Hanson did not hear any raising of voices or see any fast movements. While she was counting the chips, she saw Cagle moving around and sensed him walk past her. As she was stacking the chips, she heard a shot and turned around. She saw McNulty with a rifle under his elbow, and Cagle lying on the ground, with one foot over a chair, and his hands clasped across his chest, under his body. (Tr. at 162–63). Ms. Hanson then went out and called the police.

Ms. Hanson, on cross-examination, testified that she had heard Petitioner ask Cagle to leave, as he usually did, and that she had noticed this, as opposed to the rest of the conversation, because the volume had gone up a bit. She also testified on cross-examination that on the morning of the homicide she had taken some asthma medicine, and had also had a few drinks. Her doctor had told her not to drink while taking the medicine. Ms. Hanson testified on redirect that when Cagle fell, his head landed about two feet away from Petitioner's feet.

Petitioner testified that during the poker game Cagle had started hitting him on the shoulder. He testified that Cagle stated: "Why don't you fight so I can get you down and stomp you?" (Tr. at 235). Petitioner testified he then ordered Cagle to leave and Cagle refused, simply showing Petitioner his fist. Petitioner testified that at that point he got the rifle out of the closet and ordered Cagle to leave again. Cagle allegedly then stated: "You little punk, I can break you in half," and charged Petitioner. Petitioner testified that when Cagle was about two feet from the end of the barrel he fired. (Tr. at 236–37).

Petitioner also testified that when he had been in the military he had had hand-to-hand combat training, and had been Ranger-qualified, Airborne-qualified, and Special Forces-qualified. (Tr. at 239–40).

The first police officer to arrive at the scene testified that when he arrived he asked Petitioner what had happened, and Petitioner replied, "Nothing." The officer then asked Petitioner where the rifle was, and Petitioner told him it was on the bed. After looking at the rifle, the officer examined the body and turned it over to see if Cagle was still breathing. He was not. The officer testified that Petitioner stated: "I am glad I killed him, he deserved to die." (Tr. at 207). Petitioner denied having made this statement. The officer also testified that Petitioner made this statement in an "angry and satisfied tone," whatever that means. (Tr. at 207).

Officer Hicks, the second officer at the scene, testified that when he examined Cagle's body he found currency clenched in one hand. (Tr. at 194). Officer Hicks also testified that Cagle was wearing swimming trunks and a tank-top. Officer Hicks stated that "the apartment appeared clean, nothing was messed up, everything was in place, there was nothing turned over or anything to suggest any type of a struggle." (Tr. at 196). He also testified that Petitioner had appeared neatly dressed with his hair combed. (Tr. at 196).

One photograph of the Hanson apartment that was introduced into evidence showed a partially-smoked cigarette butt near decedent's right hand. (Tr. at 43). That cigarette butt, which had blood on it, was also introduced into evidence. (Tr. at 63). The rifle bullets had hollow points, which means that they mushroom on impact. Five rounds were found in the rifle magazine, and there was a spent shell in the chamber. (Tr. at 66).

Dexter Holst, a friend of Petitioner who lived in an apartment in Petitioner's building, testified that after he heard the shot, he was visited by Ms. Hanson who asked to use his phone. Mr. Holst went over to the Hanson apartment and saw Petitioner. He testified that Petitioner stated: "He come at me in my house, I had to do my thing." (Tr. at 113). Holst also testified that Petitioner stated in conjunction with the statement just quoted: "He was busting up my house." (Tr. at 113–18). The testimony of Holst is somewhat contentious on this point, but he essentially admitted that Petitioner had made this statement, and also that he, Holst, had so reported to a police officer.

Mr. Holst testified that the relationship between Petitioner and Cagle had been friendly. (Tr. at 125). He also testified, however, that Cagle had often needled Petitioner, and had told Petitioner that he, Cagle, could "take" him. Cagle had also, according to Holst, stated that he had killed twice before. (Tr. at 126).

## II.  ALLEGED ERRORS AT TRIAL

Petitioner's claim that he was denied effective assistance of counsel rests on three alleged errors committed at trial by Petitioner's trial counsel. The first alleged error is that the only evidence Petitioner's counsel presented as to the decedent's violent nature was the testimony of Petitioner himself.[1] About a week before trial Petitioner's counsel called David Hobler, a man who had been Cagle's court-appointed attorney, when Hobler had worked for the public defender's office. Hobler told Petitioner's counsel about Cagle's violent nature. Hobler states in an affidavit that he could have testified that Cagle was an extremely aggressive man who admitted drinking too much. Cagle had admitted to Hobler a propensity for violence in the form of physical altercations with clubs, knives, and his fists, especially while in an intoxicated state. Cagle told Hobler that he settled "beefs" with his fists, and had survived in the Penitentiary through the use of his fists. Cagle had also threatened Hobler's secretary and Hobler's wife, when he had

1.  The Hawaii Supreme Court stated in its opinion that Petitioner's counsel called two other witnesses to testify as to Cagle's violent nature. As both parties agree, this statement was incorrect. The Hawaii Supreme Court was no doubt speaking of the testimony of Mr. Holst, and Ms. Hanson, who were in actuality called by the prosecution. However, both witnesses had been friends of Petitioner, and were apparently still his friends at the time of the trial. Testimony on Cagle's violent nature did come out during their cross-examination by Petitioner's counsel.

been unable to get in touch with Hobler. Attached to Hobler's affidavit is a letter Cagle wrote to him from Halawa jail, clearly threatening physical harm. Cagle admitted to Hobler that he had attempted to strangle a woman who had employed him as a handyman. Hobler also states in his affidavit that Cagle had given a stenographic confession to the police admitting to having strangled two people he and his girl friend had been living with. A copy of that confession has been introduced into evidence in connection with this petition. Hobler states that Cagle had admitted to him that the confession was true and correct. Hobler was not called as a defense witness at Petitioner's trial.

Petitioner's second ground for claiming ineffective assistance of counsel is that the prosecutor was allowed to pursue an "improper and inflammatory cross-examination of Petitioner without objection by Petitioner's counsel." Petitioner was cross-examined by the prosecutor about allegedly putting a false address on his driver's license. He was also questioned about having gotten into fights with several individuals, and he essentially denied having participated in those fights. He was then accused by the prosecutor of lying. Petitioner's counsel did not object to the prosecutor's questions. While the Court believes that it probably would have been sound strategy to object to the types of impeachment the prosecutor was conducting, the Court is not at all sure that any objections would have been successful. Petitioner's propensity to engage in fighting was certainly relevant to the issue of self-defense. Petitioner's ability to defend himself without resorting to firearms was also in issue, and his fight "experience" was certainly relevant on that score. If Petitioner, on the stand, denied having been in particular fights, or was evasive in his answers, the prosecutor certainly had the right to further pursue the point. Petitioner's Memorandum of Law contains a statement to the effect that the prosecutor had no good faith basis for the "fight" questions, but the Court has not been shown any evidence on that score. As for the questions regarding the driver's license,

the Court notes that Hawaii, at the time of Petitioner's trial, had no formal rules of evidence. However, the applicable federal rule, Rule 608(b) states:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness . . . .

Had this been the applicable rule, the trial judge would have had to have made a determination as to whether the driver's license questions were sufficiently probative of truthfulness or untruthfulness. While such questions were perhaps borderline, there is no certainty that an objection to them would have been sustained. The Court believes that the judge in Petitioner's trial would have used a standard similar to that enunciated in Rule 608(b) had an objection been made.

The third ground for Petitioner's claim of ineffective assistance of counsel is one that the Court views as substantial. Petitioner's counsel requested a jury instruction that made it clear that the prosecution had the specific burden of disproving self-defense beyond a reasonable doubt. Petitioner's counsel withdrew that request in open court, and consented to the substitution of the prosecution's instructions. A general reasonable doubt instruction was given, but there was no specific instruction on self-defense. The Hawaii Supreme Court noted in Petitioner's appeal that the trial court's instructions had been less than ideal. "In failing to specifically allocate the burden of disproving self-defense to the state, the instructions could have permitted the jury to believe that the appellant, having raised the issue of justification, was obligated to prove it." 60 Haw. at 264, 588 P.2d at 443. The Hawaii Supreme Court held, however, that since Petitioner's counsel never objected to the trial court's failure to give his instruc-

tion, Petitioner was precluded from objecting to the lack of the instruction on appeal. In considering Petitioner's ineffective assistance of counsel argument the Hawaii Supreme Court stated:

> Appellant further argues that trial counsel's voluntary withdrawal of a requested instruction which correctly placed the burden of persuasion with respect to self-defense on the prosecution also evidences his ignorance of the law. We disagree. The fact that trial counsel tendered such an instruction in the first place could very well reflect his awareness of the possibility of giving it.

60 Haw. at 269, 588 P.2d at 446.

■ This Court also notes that Petitioner's trial counsel made at least one other questionable move during trial, although this was never brought to the attention of the Hawaii Supreme Court or to this Court. The Court brings it out only because it believes that when multiple errors are asserted, the entire performance of the trial counsel must be examined. The State, in their case-in-chief, called a police officer, Officer Freitas, to the stand. He was called, *inter alia*, because of his role as identification technician at Ms. Hanson's apartment. Officer Freitas laid the foundation for the introduction of some photographs that he took, laid the foundation for the introduction of some real evidence relating to the homicide and testified as to a diagram of the apartment that he drew. On cross-examination, Petitioner's counsel asked Officer Freitas whether he was familiar with .44 caliber Magnum rifles. Petitioner's counsel, after finding out that the officer in fact owned such a gun, asked him whether a person who was standing still and was shot at a distance of four feet with a .44 caliber Magnum shot, would be more likely to fall forward or backward. The prosecutor objected because the officer had not been qualified as an expert. Petitioner's counsel laboriously qualified the officer as an expert, and again, over objection, asked the question recited above. The officer answered that the person would be likely to fall forward. (Tr. at 80). The Court thinks it unbelievable that Petitioner's

counsel asked this question without knowing what the answer was going to be. Petitioner's counsel erred.

## III. LEGAL CONCLUSIONS

■ In *Cooper v. Fitzharris*, 586 F.2d 1325 (9th Cir. 1978) *(en banc), cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979), the Ninth Circuit set forth the test to be followed in determining whether a defendant has been denied effective assistance of counsel. First, there obviously must be errors or omissions on the part of defense counsel.

> Defense counsel's errors or omissions must reflect a failure to exercise the skill, judgment, or diligence of a reasonably competent criminal defense attorney— they must be errors a reasonably competent attorney acting as a diligent conscientious advocate would not have made
>
> . . . .

586 F.2d at 1330. And second, when "the claim of ineffective assistance of counsel rests upon specific acts and omissions of counsel at trial . . . relief will be granted only if it appears that the defendant was prejudiced by counsel's conduct." 586 F.2d at 1331.

■ Thus, the first question is whether Petitioner's trial counsel made errors that a reasonably competent attorney would not have made. As regards withdrawing the jury instruction, the Court is convinced that Petitioner's trial counsel made such an error. Despite the assertion of the Hawaii Supreme Court to the contrary, this Court can conceive of no possible tactical reason for withdrawing the instruction. The Court is convinced that either 1) Petitioner's trial counsel did not review the State's instructions carefully enough, and believed that the State's instructions covered the self-defense, reasonable doubt point, or 2) Petitioner's trial counsel thought the instruction was unimportant. If the former (and that is what the Court believes actually happened), Petitioner's trial counsel was simply careless. If the latter, Petitioner's trial counsel was simply wrong. Either

way he made an error. The Court is firmly convinced that this error was one a reasonably competent attorney, acting as a diligent conscientious advocate would *never* have made. Thus, as to the withdrawal of the instruction, the first part of the *Cooper* test is satisfied.

As for the other "errors," even if they would not have been "committed" by competent counsel, the Court considers them relatively minor in terms of any prejudicial effect on the defense. As noted above, while the Court believes Petitioner's trial counsel should have objected to certain questions, it is quite possible that any objections, if made, would and should have been overruled. As for the failure of Petitioner's counsel to call Mr. Hobler to the stand, the Court believes that while Mr. Hobler's testimony might have been helpful, it would have been cumulative. Mr. Holst testified that Cagle had told Petitioner that he could "take" him, and Holst also testified that Cagle had stated that he had killed before, twice. (Tr. at 126). Ms. Hanson testified that Cagle forced her to have sexual intercourse with him and in the course of the struggle attempted to strangle her. (Tr. at 180–81). In addition, Petitioner testified as to Cagle's violent nature. There was significant evidence before the jury indicating that Cagle was a violent man.

However, the fact that the Court views several of the "errors" of Petitioner's counsel as minor, does not mean that they are irrelevant. In *Cooper*, the court noted: "If counsel is charged with multiple errors at trial, absence of prejudice is not established by demonstrating that no single error considered alone significantly impaired the defense—prejudice may result from the cumulative impact of multiple deficiencies." 586 F.2d at 1333. Thus, in making a determination of prejudice, the Court will be considering one major error—the failure of Petitioner's trial counsel to insist on the self-defense, reasonable doubt instruction— and several possible errors of a somewhat lesser magnitude. Unfortunately, the Ninth Circuit has been less than clear in

defining exactly what is meant by prejudice. The court noted in *Cooper* that prejudice does not mean "that relief is available only if the defendant would have been acquitted but for counsel's blunders," 586 F.2d at 1333, but that is the only guidance lower courts have been given. Were the standard in this case a *Chapman* [2] type standard—error harmless beyond a reasonable doubt— the Court would grant the writ. The Court is not convinced that the errors here were harmless beyond a reasonable doubt. Petitioner's counsel did a bad job in representing Petitioner, and there is a chance that if the various errors had not been made, Petitioner would not have been convicted of murder. However, the Court does not believe the *Chapman* standard is the applicable one. Had that been the standard, the *Cooper* court could easily have enunciated it.

Prejudice must mean some real injury, some likelihood of a different result absent the errors. There are standards between harmless beyond a reasonable doubt and acquittal but for the errors. The Court believes the proper standard is the following: Absent the errors, or put another way, with a reasonably competent defense attorney (and reasonably competent does not mean perfect), is it more likely than not that the jury would have reached a different result, *i. e.*, acquittal, or conviction on a lesser charge. "But for" is not the equivalent of "more likely than not," and in addition, there are alternatives other than guilty or not guilty of the higher charge; there is guilty of a lesser offense.

Applying the above standard in this case, the Court does not believe that there was prejudice to Petitioner. The key question, obviously, was self-defense, and the Court believes that the evidence that the homicide was not committed in self-defense was so strong that the Court cannot say that it is more likely than not that the result would have been different had Petitioner had reasonably competent counsel. The evidence negativing self-defense was very strong.

2. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The decedent was found with money clutched in one hand and a blood-stained cigarette near the other. It is extremely unlikely that Cagle would have had both hands full at the time he was allegedly rushing at Petitioner with the intent to break him in two. The fact that Petitioner, on the very day of the homicide, redeemed a rifle that had been in the pawn shop for eight months, points toward a premeditated killing rather than self-defense. The testimony of Ms. Hanson that Petitioner said, on the day of the killing, that he had some business to take care of since Cagle was getting out that day, is a strong indicator of premeditation, and also directly contradicts Petitioner's statement that he had had no idea when he picked up the rifle that Cagle was getting out that day. There is Ms. Hanson's testimony that she did not hear raised voices before the shooting; Mr. Holst's testimony that Petitioner stated that he had to do it as Cagle was busting up his house; and Officer Silva's testimony that Petitioner stated "I'm glad I killed him, he deserved to die." There is also a good deal of evidence that Petitioner knew how to take care of himself in a fight—he had had hand-to-hand combat training, and was Ranger-qualified, Airborne-qualified, and Special Forces-qualified. Petitioner also testified that he had been in fights before. (Tr. at 262). Finally, there is a clear motive for murder—Cagle had been trying to take Ms. Hanson away from Petitioner, and Petitioner knew it. Petitioner had threatened to kill both Ms. Hanson and Cagle, and Petitioner had been told by Ms. Hanson, upon his return from Detroit, that she and Cagle had been out to dinner together. Given all this evidence, and especially 1) the evidence of the money clenched in Cagle's one hand and the blood-stained cigarette near the other, and 2) the fact that Petitioner redeemed the rifle the morning of the killing, the Court cannot say that it was more likely than not a jury would have acted differently had Petitioner had a reasonably competent defense attorney. Thus, the Court cannot say that Petitioner was prejudiced because of the errors of his trial counsel. The petition for a writ of habeas corpus is DENIED.